| | | |
|---|---|---|
| BRITT LOBOV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 12-40168-TSH |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
June 23, 2014

Hennessy, M.J.

Pursuant to 28 U.S.C. § 636(b)(1)(B), and by Order of Reference (Docket #23), this matter was referred to me for a Report and Recommendation on Plaintiff Britt Lobov's Motion for Order Reversing the Decision of the Commissioner (Docket #15) and the Defendant's Motion to Affirm the Decision of the Commissioner (Docket #21). These motions are ripe for adjudication. For the reasons stated below, I recommend that Lobov's motion be DENIED and the Commissioner's motion be ALLOWED.

## BACKGROUND

Lobov filed for Social Security Disability Insurance Benefits ("DIB") and Social Security Supplemental Security Income ("SSI") on April 29, 2009, alleging disability beginning October

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue, as the Acting Commissioner of the Social Security Administration as of February 14, 2013.

4, 2007.[2]  (Tr. 139-46).[3]  The Social Security Administration ("SSA") originally denied Lobov's applications on November 19, 2009.  (Tr. 73).  Lobov filed a Request for Reconsideration but the SSA again denied her applications for DIB and SSI on June 16, 2010.  (Tr. 77).  Thereafter, Lobov requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 83).

An ALJ held a hearing on July 14, 2011.  (Tr. 3).  On September 16, 2011, the ALJ issued a decision denying benefits, finding that Lobov was not disabled.  (Tr. 44-63).  On October 6, 2011, a timely Request for Review of the Hearing Decision was filed with the Social Security's Appeals Council.  (Tr. 33).  On October 9, 2012, the Appeals Council denied Plaintiff's request for review and the September 2011 decision became the final decision of the Commissioner.  (Tr. 26).

## A.  <u>Personal, Educational, and Occupational History</u>

Lobov was twenty-six years old on October 4, 2007, the date she claims she became disabled.  (Tr. 141).  She graduated from high school and completed at least six months of college.  (Tr. 7).  Her past relevant work includes employment as a home health aide, pizza maker, medical records clerk, mental retardation aide, automobile service station attendant, and dispatcher.  (Tr. 18).

## B.  <u>Medical History</u>

On February 9, 2007, Lobov was involved in a motor vehicle accident and sustained a back injury.  (Tr. 229).  On October 23, 2008, Lobov visited UMass Memorial hospital and was

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

[3] A transcript of the Social Security Administration official record (*"<u>Tr.</u>"*) has been filed with the court.  (Docket #14).

treated by Dr. Said. (Tr. 224). Dr. Said diagnosed Lobov with morbid obesity. (Id.). With regard to her depression, Dr. Said observed that Lobov was doing "extremely well" and continued to participate in therapy at the Prescott Health Center, which continued through at least October 27, 2009. (Tr. 224, 315). Dr. Said prescribed Vicodin for Lobov's back pain. (Tr. 224).

On January 8, 2009, Lobov again visited Dr. Said, complaining of neck pain and lower back pain, hip pain, hand pain, and swelling of the hands. (Tr. 223). Lobov indicated that she had migraines that come every change of season, or about four times a year. (Id.). Dr. Said diagnosed her to be morbidly obese, and further opined that Lobov had very mild scoliosis and seasonal migraines, for which she was to see Dr. Markley. (Id.).

Lobov was evaluated by Dr. Charles Birbara, a rheumatologist, on February 18, 2009, for complaints of muscular and skeletal pains. (Tr. 258-60). Lobov reported pain in her left bicep and hands and swelling in her wrists. (Id.). Lobov also indicated that her back pain had progressively worsened and that she was very depressed. (Id.). Dr. Birbara diagnosed Lobov with hyper-mobility syndrome ("HMS"), obesity, fibromyalgia, suicidality, bipolar disorder, and a history of cocaine use with sobriety since October 2007. (Tr. 260).

On May 28, 2009, Dr. Mark Kaplan completed a Treating Physician Report based on his observations of Lobov in February 2009. (Tr. 275-76). Lobov complained of chronic low back and sacral pain with radiation to the hips that had been exacerbated by the motor vehicle accident in February 2007. (Id.). Dr. Kaplan found Lobov had limited spinal range of motion and it was his impression that most of her problems were the result of her morbid obesity. (Id.). Dr. Kaplan concluded that Lobov's obesity would preclude her from performing work at the light duty level because of the prolonged standing and walking requirements involved. (Tr. 276).

However, Dr. Kaplan concluded that Lobov would be able to perform full-time sedentary work. (Id.).

On June 15, 2009, Dr. S. Ram Upadhyay, a Department of Developmental Services medical consultant, completed a physical residual functional capacity ("RFC") assessment of Lobov. (Tr. 281-88). Dr. Upadhyay indicated Lobov's back ailments, fibromyalgia, and her obesity as prior diagnoses or impairments. (Tr. 281). Dr. Upadhyay found that Lobov could occasionally lift twenty pounds and could frequently lift ten pounds. (Tr. 282). He also found that Lobov could stand and/or walk with normal breaks for a total of at least two hours in an eight-hour workday, that she could sit for about six hours in an eight-hour workday, and that she had an unlimited ability to push and/or pull. (Id.). With regards to postural limitations, Dr. Upadhyay found that Lobov could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 283). Dr. Upadhyay found Lobov did not have any other limitations except avoiding concentrated exposure to hazards because of her lack of agility. (Tr. 283-85). On June 1, 2010, Dr. E. Montoya affirmed Dr. Upadhyay's physical RFC assessment. (Tr. 349).

Lobov saw Dr. C. Graham Campbell on October 8, 2009, and he performed a psycho-diagnostic interview.[4] (Tr. 290-94). Dr. Campbell acknowledged Lobov's obesity, specifically noting that she stood 5'6" and weighed approximately 325 pounds. (Tr. 290). He found that Lobov was alert and responded to questions directly and logically. (Tr. 290-91). Lobov denied auditory and visual hallucinations or other symptoms of a formal thought disorder, her affect varied appropriately according to the topic being discussed, and she reported discrete episodes of intense anxiety with symptoms including heart pounding, difficulty breathing, tingling in the

---

[4] Lobov was referred for evaluation by the Massachusetts Rehabilitation Commission as part of an application for disability. (Tr. 290).

hands, shaking, and fear of death.[5]  (Tr. 291).  Dr. Campbell stated that "[i]f she is to become successfully employed her anxiety will need to be more aggressively treated than it is at this time."  (Tr. 293).  Dr. Campbell determined that Lobov's abstract reasoning was intact, her fund of knowledge was adequate, and she did not appear to have cognitive deficits.  (Id.).

On November 12, 2009, Dr. Ginette Langer completed a psychiatric review technique form ("PRTF"), as well as a mental RFC assessment of Lobov.  (Tr. 317-30).  Dr. Langer found Lobov was mildly limited in daily activities; moderately limited in maintaining social functioning; moderately limited with maintaining concentration, persistence, or pace; and had no episodes of decompensation.  (Tr. 327).  Furthermore, Dr. Langer determined that Lobov did not have significant limitations with understanding or adaption.  (Tr. 331-32).  Specifically, Dr. Langer found that Lobov would be able to concentrate and maintain her attention for at least a two-hour time period, but was socially inappropriate[6] and would not be able to work with the general public.  (Tr. 332, 333).

Dr. Imad Khreim, a psychiatrist, treated Lobov on several occasions.  (Tr. 352-64).  On February, 18, 2010, Dr. Khreim noted that Lobov was anxious, depressed, had nightmares of a violent nature that prevented her from sleeping, and she felt angry and sad at the same time.  (Tr. 353).  On numerous occasions, he indicated that Lobov seemed stable and alert and her mental status examinations were benign.  (Tr. 352-64).  Dr. Khreim continued to evaluate and treat Lobov over several visits, most recently on March 14, 2011.  (Tr. 352).

---

[5] Lobov experiences these episodes twice per week and they can last for fifteen minutes to two hours.  (Tr. 291).

[6] There is a contradiction in Dr. Langer's PRTF.  Dr. Langer checked off the box that indicated Lobov was markedly limited in her ability to interact appropriately with the general public.  (Tr. 332).  Then, Dr. Langer noted Lobov "will be socially appropriate. She will not be able to work with the general public."  (Tr. 333).  It appears Dr. Langer made a mistake and intended to document that Lobov was socially inappropriate, rather than appropriate.

Lobov completed a function report on March 16, 2010. (Tr. 187-94). Lobov indicated that she rarely socializes and sometimes remains in bed all day. (Tr. 187, 188). However, Lobov did report that she takes care of her cats, prepares her own meals, is able to do her own laundry, is able to shop for food and necessities, and is able to balance her finances. (Tr. 187-90). Lobov stated that she had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, and getting along with others, but did not complain of problems using her hands. (Tr. 192).

On May 20, 2010, medical consultant M. Berkowitz completed a mental RFC assessment of Lobov. (Tr. 339-46). Berkowitz found that Dr. Langer's conclusion that Lobov will not be able to work with the general public was inconsistent with the record. (Tr. 341). Berkowitz noted that, although Lobov has symptoms of panic and anxiety in social situations, she is able to go out in public alone, can use public transportation, and describes herself as only slightly agoraphobic. (Id.). Berkowitz concluded that Lobov appears capable of persisting at a range of simple tasks with no more than moderate public contact. (Id.).

On April 7, 2011, Lobov was examined by Dr. Hurwitz at UMass Memorial with complaints of dizziness, migraine headaches, and heartburn. (Tr. 422). Lobov reported that she experienced dizziness when walking downstairs and these episodes lasted for twenty to thirty seconds. (Id.). Lobov complained of migraine headaches, averaging two to three per week. (Id.). On May 5, 2011, Lobov followed up with UMass Memorial for her migraine headaches and dizziness. (Tr. 421). Lobov reported experiencing two to three "bad" headaches since her last visit but that her dizziness had improved. (Id.). Dr. Hurwitz prescribed Topamax for Lobov's migraines. (Id.).

On June 14, 2011, Lobov's mental health therapist, Nancy Vukmirovits, completed a PRTF and determined that Lobov met listings pursuant to 12.04 for affective disorders and 12.06 for anxiety disorders. (Tr. 444). She concluded that Lobov was extremely limited with activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace; and had four or more episodes of decompensation. (Tr. 453). Furthermore, she found that Lobov developed a resistance to her medication quickly, the medication was ineffective, or she had significant side effects. (Tr. 454).

On June 15, 2011, Dr. William Crooks completed a Physical RFC Questionnaire on Lobov, pursuant to a request from Lobov's attorney so that it "may be used to support a Social Security Claim." (Tr. 456-61). Dr. Crooks noted that he had seen Lobov three times since May 2011, and diagnosed Lobov with fibromyalgia and depression, as well as a fair prognosis. (Tr. 457). According to Dr. Crooks, Lobov's impairments could be expected to last at least twelve months. (Id.). During a typical work day, Dr. Crooks found that Lobov's experience of pain or other symptoms would be severe enough to constantly interfere with the attention and concentration required to perform simple work tasks, and she would be incapable of even "low stress" jobs as a result of her chronic, constant, and diffuse pain. (Tr. 458).

With regards to her functional limitations, Dr. Crooks found that Lobov could not walk any city blocks without rest or experiencing severe pain. (Id.). In an eight-hour workday with normal breaks, Dr. Crooks determined that Lobov could sit and stand/walk for a total of less than two hours, and she would require unscheduled breaks every five to ten minutes lasting approximately two to three minutes before she could return to work. (Tr. 458-59). He opined that Lobov could rarely look down, turn her head right or left, look up, or hold her head in a static position. (Tr. 460). Dr. Crooks indicated that Lobov could never twist, stoop, crouch or

squat, climb ladders, or climb stairs, and that she would miss more than four days of work per month.  (Id.).

## C.  **ALJ Hearing**

At the July 14, 2011 hearing, the ALJ heard testimony from Lobov and a vocational expert.  (Tr. 8-20).  The ALJ questioned Lobov about her work history and the different tasks she performed.  (Tr. 8-13).  Lobov testified that she suffered from severe anxiety and had lost several friends due to her depression.  (Tr. 15).  Lobov testified that her panic attacks last anywhere from ten minutes to days.  (Tr. 16).  Lobov stated that she is "ok" for a few days, but then a "light switch" goes off in her brain and she will shut down.  (Tr. 23).  Lobov testified that she did not believe she could get to work on time and sometimes she will not leave her house for five, six, or seven days at a time.  (Tr. 24).

Following Lobov's testimony, the ALJ asked a vocational expert for her assessment on the skill and exertional levels of Lobov's work history.[7]  (Tr. 18).  The ALJ asked the vocational expert to consider:

> a hypothetical individual 30 years of age with a high school education and at least one college course under the individual's belt and past relevant work as has been characterized for this matter. This individual's medical history includes low back pain, secondary to scoliosis, versus degenerative joint disease, morbid obesity, indications of fibromyalgia syndrome, possible hip arthritis, hypothyroidism, migraines, depression, bipolar, anxiety, and panic disorders. For the first hypothetical question we'll limit this individual to light work requiring no more than occasional bending or twisting. It should also require no more than occasional overhead reaching and it should be in a low stress environment that is a position which would not be dependent upon meeting strict quota requirements. Given those limitations could such an individual perform any of this claimant's past relevant work either as she performed it or as it is generally performed in the national economy?

---

[7] The vocational expert considered Lobov's experiences as a home health aide, pizza maker, medical records clerk, mental retardation aide, automobile service station attendant, and dispatcher.  (Tr. 18).

(Tr. 18-19).  The vocational expert responded that the hypothetical individual could not perform past work, but could perform other work in the local and national economy, specifically identifying 2,000 inspector positions, 1,500 sorter positions, and 2,000 packaging positions in Massachusetts, with these figures significantly increasing on a national level.  (Tr. 19-20).  The ALJ then asked the vocational expert, if the hypothetical individual's exertional capacity was reduced to sedentary, what available jobs, if any, she could perform.  (Tr. 20).  The vocational expert cited 600 inspector positions, 600 sorter positions, and 500 packaging positions in Massachusetts, with a significant increase in the national labor market, that the hypothetical individual could perform.  (Id.).  The vocational expert testified that each position would be reduced by fifty percent if there was the imposition of a sit/stand option.  (Id.).

### D.  ALJ Decision and Findings

In assessing Lobov's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.  See 20 C.F.R. § 404.1520.

First, the ALJ considers the claimant's work activity and determines whether he or she is "doing substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Here, the ALJ found that Lobov had not engaged in substantial gainful activity since October 4, 2007, the alleged onset date of her disability.  (Tr. 49).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ determined Lobov suffered from the following severe impairments: "low back pain secondary to scoliosis versus degenerative joint disease, morbid

obesity, fibromyalgia, conjectured hip arthritis, migraine headaches, depression, bipolar disorder, anxiety disorder, and panic disorder." (Tr. 49).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations ("SSR"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled. Id. The ALJ found that Lobov did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment. (Tr. 50).

At the fourth step, the ALJ considers the claimant's RFC and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Whenever there is a determination that the claimant has a significant limitation, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(e). An individual's RFC is her ability to do physical and mental work activities on a sustained basis, despite her limitations. 20 C.F.R. § 404.1545(a)(1). In the present case, the ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual function capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except her work must permit a sit-stand option in a low stress environment. The claimant cannot perform more than occasional overhead reaching.

(Tr. 52 (footnote omitted)). In making this finding, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence in the record. (Id.). The ALJ found that Lobov was unable to perform her past relevant work. (Tr. 61).

At the fifth and final step, the ALJ asks whether the claimant's impairments prevent her from performing other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ determined that, based upon Lobov's RFC and the vocational expert's testimony, jobs exist in significant numbers in the national economy that Lobov can perform, including packaging, sorter, and inspector.  (Tr. 61-62).  Therefore, the ALJ found that Lobov was not disabled under the Social Security Act.  (Tr. 62).

## STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  Review by this Court is limited to whether the Commissioner's findings were supported by substantial evidence and whether correct legal standards were applied.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (defining substantial evidence as "more than a mere scintilla").  In other words, the determination must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Furthermore, this Court must uphold the Commissioner's determination "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

It is the role of the Commissioner, not this Court, to draw factual inferences, make credibility determinations, and resolve conflicts in the evidence.  See Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981); Geoffrey v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981) ("the

court's function is a narrow one[,] limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements"). However, this Court may reverse or remand a case when there has been a legal or factual error. Bazile v. Apfel, 113 F. Supp. 2d 181, 190 (D. Mass. 2000); see Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (determining Commissioner's findings inconclusive when "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts"). In the absence of a legal or factual error, conflicts presented by the record are resolved by the Commissioner and this Court is prohibited from performing such tasks. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).

## DISCUSSION

Lobov claims that the ALJ's decision is not supported by substantial evidence and should be reversed. (Docket #16, p. 11). To support this claim, Lobov argues that the ALJ failed to properly consider her morbid obesity and migraine headaches in reaching his RFC determination. (Id.). Lobov further argues the ALJ improperly weighed opinion evidence, specifically asserting that the ALJ disregarded the treating physician rule and exhibited clear bias against Lobov's treating physicians. (Id. at p. 13). The Commissioner opposes such arguments and seeks to affirm the ALJ's decision that Lobov is not disabled. (Docket #22, p. 1).

A. **The ALJ Properly Considered Plaintiff's Obesity and Migraines**

1. Obesity

Lobov claims that while the ALJ acknowledged that Lobov suffered from morbid obesity and that it was a severe impairment, the ALJ failed to assess the effect of this and other impairments on her ability to work, and on her ability to perform routine movement and necessary physical activity within the work environment, as required by SSR 02-1p. (Docket

#16, p. 12). Far from supporting the distinction Lobov draws, the record shows the ALJ carefully considered the effect of her impairments, including obesity, on her ability to work and on activities and movement ancillary to work.

The SSA requires an ALJ to consider the effects of a claimant's obesity at all stages of the evaluative process, including during the RFC assessment. See SSR 02-01p. Obesity, in and of itself, can cause limitations in "exertional functions such as sitting, standing, walking, lifting, carrying, pushing and pulling," in addition to "postural functions, such as climbing, balance, stooping, and crouching." Id. The SSR provisions further emphasize that the combined effects of obesity with other impairments may be greater than that which might be expected from the impairments considered separately. Id. SSR 02-01p mandates ALJs to consider obesity and to provide an explanation regarding the functional limitations as a result of the claimant's obesity. See Miller v. Astrue, No. 2:10-CV-41, 2011 WL 3439273, at *3 (D.N.D. July 13, 2011).

Here, contrary to Lobov's claim, the ALJ explicitly and implicitly considered the effects of Lobov's morbid obesity on her RFC (ability to work) and her ability to perform routine activities ancillary to work. For instance, the ALJ found that Lobov's obesity was a severe impairment which, when considered in combination with other impairments, supported a conclusion that the impairments "cause[d] significant limitation in claimaint's ability to perform basic work activities." (Tr. 49-50). This finding not only follows the letter of SSR 02-01p, but expressly quantified ("significant") the impact of Lobov's obesity and other impairments.

Similarly, the ALJ's review of the medical record reflects an ongoing assessment of the effects of Lobov's impairments on her ability to work. For instance, the ALJ assigned significant weight to the diagnosis and report of Dr. Kaplan, which attributed Lobov's problems to her obesity. (Tr. 55). Kaplan's opinion included a specific assessment of the impact obesity

and other issues had on her ability to work: he said that "he would not expect that [Lobov] could be able to perform work at a light duty level, due to the frequent requirement of prolonged standing and sitting [,but that t]his would not prevent her from performing full time sedentary work." (Tr. 55). Dr Upadhyay and Dr. Montoya, both State agency medical consultants, found that the impact of Lobov's impairments was not so restrictive. They opined that Lobov could stand and/or walk for at least two hours in an eight-hour work day, and could do "occasional climbing, ramps, stairs, ladders, ropes or scaffolds." (Tr. 60). The ALJ assigned "[o]nly some weight" to these opinions precisely because, based on his finding that Lobov's impairments were consistent with the limitations of sedentary work, he disagreed that they accurately quantified Lobov's ability to work. Id. To the opinion of Dr. Crooks, which determined that Lobov was incapable of even a low stress job, and could not walk a block without a rest or pain, the ALJ assigned significant, but not controlling weight. (Tr. 55-56). The ALJ found that Dr. Crooks' opinion was inconsistent with the longitudinal history. (Tr. 56). The ALJ stated that it was particularly noteworthy that Dr Crooks' opinion was solicited to "support" a social security claim. (Id.). However, the ALJ's finding regarding Dr. Crooks nevertheless reflects a fundamental assessment of the effects of Lobov's impairments, i.e. that they were not as severe as Crooks opined.

Beyond these medical opinions, the ALJ confirmed that he had considered the entire record in reaching his RFC assessment, including all of Lobov's symptoms to the extent they were reasonably consistent with the objective medical evidence and other evidence in the record. (Tr. 52). The ALJ referenced Lobov's obese condition throughout his findings and utilized the opinions of Lobov's physicians knowledgeable of her condition. (Tr. 52-61). The ALJ considered Lobov's postural and functional limitations, as diagnosed by several physicians. (Tr.

53-62).  Furthermore, the ALJ explicitly referenced SSR 02-01p and noted that the SSA considers "a BMI [Body Mass Index] in excess of 30 to be evidence of a severe impairment for obesity when evidence demonstrates the obesity is the cause for other impairments."  (Tr. 54).

The ALJ appropriately relied on the opinions of Lobov's physicians who determined Lobov could perform sedentary or light work, despite her morbid obesity.  See Correia-Pires v. Astrue, No. 10-10724-DPW, 2011 WL 3294903, at *10 (D. Mass. July 29, 2011) (finding that ALJ gave appropriate weight to the impact of claimant's obesity by assigning probative value to medical opinions that concluded claimant was able to perform sedentary work despite her obesity);  Lafrennie v. Astrue, No. 09-40143-FDS, 2011 WL 1103278, at *11 (D. Mass. Mar. 23, 2011) (finding that the ALJ adequately considered claimant's obesity in determining the RFC because it largely mirrored the assessment of the doctor upon whom the ALJ relied to find that claimant's obesity was a severe impairment).

Based on this record, the hypotheticals the ALJ posed to the vocational expert expressed the impact of Lobov's impairments by requiring limitations on types of work Lobov could do and on routine physical activities that might be required to perform such work.  Here, the ALJ posed a hypothetical that would limit an individual with Lobov's severe impairments "to light work requiring no more than occasional bending or twisting.  It should also require no more than occasional overhead reaching and it should be a low stress environment that is a position which would not be dependent upon meeting strict quota requirements."  (Tr. 19).  This hypothetical expresses a number of limitations tailored to accommodate Lobov's impairments, including morbid obesity.  "Light work" is defined in the SSR as involving:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,

or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1527(b). The ALJ added additional restrictions to the "light work" of less stress and no more than occasional bending, twisting, or overhead reaching. The ALJ further refined the hypothetical to quantify the potential effects of Lobov's impairments, asking the vocational expert if the individual's "exertional capacity was reduced to sedentary" what employment she might be able to perform. (Tr. 20). "Sedentary work" is (like light work) a term of art. It is defined as:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Each hypothetical the ALJ posed was a means of quantifying the extent to which Lobov's impairments impacted her ability to work.

Given this record, Lobov has failed to carry her burden showing that as a result of her obesity she was more limited than the ALJ determined in his RFC assessment. 20 C.F.R. § 404.1520(f). Indeed, Lobov's quarrel with the ALJ's assessment of the effect of her obesity is, in reality, with form and not substance. It may be that the ALJ's assessment of the impact of her obesity on her ability to work and to perform routine movement is not presented in a format she would like, but, as the foregoing shows, it ignores the record to claim, as Lobov does, that the ALJ failed to quantify the extent to which her impairments impacted her ability to work. See Bledsoe v. Barnhart, 165 Fed. Appx. 408, 412 (6th Cir. 2006) ("It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.").

2. Migraine Headaches

Lobov also claims that the ALJ failed to consider the effects of her migraine headaches in assessing her RFC. (Docket #16, p. 12). As an initial matter, Lobov failed to allege in her application or at the ALJ hearing that her migraine headaches were a disabling impairment. (Tr. 23-24, 153, 182). See Gray v. Heckler, 760 F.2d 369, 374 (1st Cir. 1985) (declining to remand to consider a mental impairment that claimant did not advance in disability application or hearing where claimant did not present evidence of the practical consequence of that disability).

Putting this procedural defect aside, this claim is nevertheless without merit. The ALJ expressly stated that he had considered the entire record, including all of Lobov's symptoms to the extent they were consistent with the objective medical evidence. (Tr. 52). In support of his RFC evaluation, the ALJ relied, in part, on Dr. Said's opinion, which indicated Lobov suffered from migraine headaches four times a year (seasonal migraines). (Tr. 53). The ALJ also considered Dr. Hurwitz' report addressing Lobov's complaint of migraine headaches and the prescribed medical treatment therefore. (Tr. 55). Based on all the objective medical evidence, Lobov has failed to carry her burden showing that she was more limited than the ALJ determined in his RFC assessment. 20 C.F.R. § 404.1520(g).

### 3. Hypothetical Posed to the Vocational Expert

Lobov further contends that the ALJ failed to satisfy his burden at step five by neglecting to add the effects of morbid obesity and migraine headaches to the hypothetical provided to the vocational expert, thereby rendering the opinion invalid. (Docket #16, pp. 12-13). "The point of the hypothetical question is to clearly present to the [vocational expert] a set of limitations that mirror those of the claimant." Roe v. Chater, 92 F.3d 672, 676 (8th Cir. 1996). "In order for a vocational expert's testimony to constitute substantial evidence, the vocational expert's opinion must be in response to a hypothetical that accurately describes the claimant's impairments."

Cohen v. Astrue, 851 F. Supp. 2d 277, 284 (D. Mass. 2012). Here, the ALJ expressly included obesity and migraines into the hypothetical posed to the vocational expert. (Tr. 18-19). This prompted the vocational expert to answer that the hypothetical individual would not be able to perform her past relevant work, but that there did exist a significant number of jobs in the national economy this individual could perform. (Tr. 19). The ALJ further tailored the hypothetical to mirror Lobov's limitations caused by her obesity and other impairments. For instance, the ALJ asked the vocational expert if the number of jobs would reduce if the exertional levels were reduced to sedentary or if there was the imposition of a sit/stand option. (Tr. 20). In sum, I conclude that the hypotheticals were comprehensive and clearly presented limitations that mirror those of Lobov, and that the vocational expert's responses serve as substantial evidence to sustain the ALJ's burden of identifying alternative work at step five.

    4. Substantial Evidence Supports the Commissioner's Decision

    Assuming arguendo that the ALJ's written assessment of the effects of Lobov's morbid obesity and migraine headaches could have been more detailed and more explicitly stated than they were, and assuming that the ALJ's hypotheticals could have been even more focused, the issue before this Court is whether substantial evidence supports the Commissioner's determination. 42 U.S.C. § 405(g). As noted previously, the court's function is a narrow one, limited to addressing whether the evidentiary standard is met and whether the determination conformed to statutory requirements. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) ("Although more express findings . . . than those given here are preferable, we have examined the entire record and their adequacy is supported by substantial evidence."). Here that standard is met. The ALJ's statement that he relied on the entire record is supported by his thorough recitation of the medical evidence and other evidence, his

evaluation of the evidence and his assignment of weights to the opinions of the available medical sources. His finding that Lobov is not disabled is supported by no fewer than three medical opinions. (Tr. 53 (Dr. Said), 54-55 (Dr. Kaplan), 60 (Dr. Upadhyay and Dr. Montoya)).

To the extent there are conflicts in the record evidence – particularly between the opinions just mentioned and that of Dr. Crooks -- it is up to the ALJ, not this Court, to resolve such issues. Seavey, 276 F.3d at 10. Though the ALJ'S RFC determination may be based on a record that contains conflicting medical evidence, the resolution of any evidentiary conflicts remains the responsibility of the Commissioner. 42 U.S.C. § 405(g); see Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 447 (1st Cir. 1991) (finding ALJ could rely on a single physician's conclusions even though some evidence supported a more serious condition). Here, Lobov is requesting that this court re-weigh the evidence, but a review of the record clearly demonstrates that the ALJ's RFC assessment is supported by substantial evidence. See Correia-Pires, 2011 WL 3294903, at *6 (finding ALJ's conclusion that treating source's opinion was not entitled to significant probative weight was supported by substantial evidence because the opinion was contradicted by four other physicians).

**B.    The ALJ Properly Weighed the Opinion Evidence**

Lobov argues that the ALJ improperly weighed the opinions of Dr. Crooks, Therapist Vukmirovits, and Dr. Campbell. (Docket #16, pp. 13-16). Lobov contends that the ALJ failed to cite to specific examples within the record that were inconsistent with their opinions and the ALJ impermissibly disregarded Dr. Crooks and Therapist Vukmirovits' opinions because they were "solicited." (Id.). As discussed below, these arguments fail.

1.    Dr. Crooks' Treating Physician Opinion

A treating physician's opinion as to the nature and severity of a claimant's impairments is entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). When an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must consider the following factors to determine what weight to actually give the opinion: the length, nature, and extent of treatment and the frequency of the examination; supportability of the opinion by evidence; consistency with the record; the specialization of the treating source; and any other relevant factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6); see Rodriguez Pagan, 819 F.2d at 3 (holding that ALJ was not required to assign treating physicians' opinions controlling weight because the opinions were based excessively on claimant's subjective complaints, rather than on objective medical findings). "When a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply." Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994); see Leahy v. Raytheon Co., 315 F.3d 11, 21 (1st Cir. 2002) ("When other evidence sufficiently contradicts the view of a treating physician, that view appropriately may be rejected.").

Here, the ALJ afforded "significant, but not controlling weight" to the opinion of Lobov's treating physician, Dr. Crooks, because his opinion was "not consistent with the longitudinal history above, in terms of describing the limitations applicable." (Tr. 56). While it is true, as Lobov claims, that the ALJ did not cite to specific instances of inconsistencies in the record in assigning non-controlling weight to Dr. Crooks' opinion, there is no mystery as to what the ALJ was referring. Dr. Crooks completed a Physical RFC Questionnaire on Lobov and found that she was incapable of even "low stress" jobs due to her chronic, constant, and diffuse

pain. (Tr. 458). He indicated Lobov could not walk any city blocks before requiring rest or experiencing severe pain, must never lift any weight, could rarely look down, turn her head right or left, or hold her head in a static position. (Tr. 458-461). He further indicated that Lobov could never twist, stoop, crouch or squat, climb ladders or stairs. (Tr. 460). Dr. Crooks' opinion and findings were at odds with no less than three other physicians. See Correia-Pires, 2011 WL 3294903, at *6 (finding ALJ's conclusion that treating source's opinion was not entitled to significant probative weight was supported by substantial evidence because the opinion was contradicted by no less than four other physicians). Dr. Kaplan stated Lobov's problems were related to her morbid obesity, but despite her condition, she would not be prevented from performing full-time sedentary work. (Tr. 275-76). Dr. Upadhyay opined that Lobov was limited to light work and would be limited to occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. 281-83). This finding was affirmed by Dr. Montoya. (Tr. 349). Each of these conflicting opinions are part of the record, thoroughly recounted by the ALJ, and that record makes pellucid the justification for the ALJ's resolution of these conflicts which assigned non-controlling weight to Dr. Crooks' opinion.

Furthermore, even if it would have been helpful had the ALJ expressly cited the inconsistencies that supported his assignment of non-controlling weight, it is settled that an ALJ is not required to "expressly refer to each document in the record, piece-by-piece." Rodriguez v. Sec'y of Health & Human Servs., No. 90-1039, 915 F.2d 1557 (Table), 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990); see NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."). In the court's view, the inconsistency on which the ALJ based his decision to afford "significant, but not controlling weight," to Dr. Crooks'

opinion is transparent and, based upon the discrepancies in the record, the ALJ's decision was supported by substantial evidence.

2.   Therapist Vukmirovits and Dr. Campbell

The same reasoning and record defeats Lobov's claim that the ALJ failed to cite to specific inconsistencies in the record to explain his assessment of the opinions of Therapist Vukmirovits and Dr. Campbell. Dr. Campbell performed a psychodiagnostic interview with Lobov on October 8, 2009, and assigned her a Global Assessment of Functioning ("GAF") score of 45. (Tr. 58). A GAF score of 41 to 50 indicates serious symptoms or any serious impairment of social or occupational functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, (4th Ed. 1994). In assigning little weight to this opinion, the ALJ noted it was "highly inconsistent" with his own examination of Lobov and, without specific citation, "the longitudinal record as a whole." (Tr. 58). The record included prior GAF scores of 58 (October 2007), and 55 (March 2009). (Tr.56-57). Scores in that range indicate "moderate" (and not serious) symptoms or difficulty in social and occupational functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, (4th Ed. 1994). The record included an entry from Dr. Said, dated January 2009, which noted that Lobov did not intend to seek disability for depression, that she played with her nephews, and was sleeping well. (Tr. 57). Another entry from Dr. Said dated February 19, 2009 stated that Lobov had only a mildly depressed mood and affect. (Id.). Hence, despite the lack of specific citation, it is clear what evidence informed the ALJ's determination that Dr. Campbell's opinion was "highly inconsistent" with the record.

Similarly, Therapist Vukmirovits concluded that Lobov was "extremely limited" with activities of daily living; maintaining social functioning; and maintaining concentration,

persistence or pace. (Tr. 453). Contrary to Lobov's claim that the ALJ's citation to the longitudinal history was pretextual, the record is rife with instances and medical opinions that do not square with Therapist Vukmirovits' conclusions.

Further, the ALJ was entitled to consider that Therapist Vukmirovits was not an acceptable medical source. See 20 C.F.R. §§ 404.1502, 404.1513. This Court does not consider therapists to be acceptable medical sources within the meaning of the Code of Federal Regulations and an ALJ is granted wide discretion in weighing a therapist's opinion. Gagnon v. Astrue, No. 11-CV-10481-PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012) ("When deciding how much weight to give a therapist's opinion, an ALJ is only constrained by the duty to reach a conclusion supported by substantial evidence in the record."); see Smith v. Barnhart, No. Civ.A. 04-30122-KPN, 2005 WL 548319, at *7 (D. Mass. Mar. 4, 2005) ("The court itself has lent support to the proposition that therapists, like nurses, are not acceptable medical sources."). Although the opinions of therapists are not assigned "controlling weight," they may be useful to show "the severity and effects of impairment." Alcantara v. Astrue, 257 Fed. Appx. 333, 334-35 (1st. Cir. 2007). The ALJ appropriately considered the opinion of Therapist Vukmirovits and ultimately concluded that it was "not supported by the longitudinal history above, as pertaining to anything more than brief, situationally induced periods, not greater than 12 continuous months." (Tr. 60). In light of this conclusion, the ALJ correctly refrained from assigning controlling weight to her opinion. See Taylor v. Astrue, 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (finding opinions of those who are not acceptable medical sources are not entitled to controlling weight). Therefore, this argument fails.

    3.   <u>Solicited Opinions of Dr. Crooks and Therapist Vukmirovits</u>

Lobov asserts that the ALJ discredited the opinions of Dr. Crooks and Therapist Vukmirovits because they were "solicited" in support of Lobov's applications for disability. (Docket #16, pp. 14-15). In weighing the opinion of Dr. Crooks, the ALJ stated:

> The undersigned finds the treating source medical opinion, solicited to accommodate this application…is given significant, but not controlling weight, as it is not consistent with the longitudinal history above, in terms of describing the limitations applicable. Particularly noteworthy is the statement in the letter soliciting the accommodation: "…in order that they may be used *to support* a Social Security Claim." (Emphasis added). i.e., it is not sought to assist in an effort to find the truth, but to support the claim. The treating source is, in essence, being told what to say.

(Tr. 56). With regards to advocacy opinions, the First Circuit has found:

> In our review of social security disability cases, it appears to be a quite common procedure to obtain further medical reports, after a claim is filed, in support of such a claim. Something more substantive than just the timing and impetus of medical reports obtained after a claim is filed must support an ALJ's decision to discredit them.

Gonzales Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749 (1st Cir. 1987); see also Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998) ("in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it"). Although it is impermissible for an ALJ to disregard a treating source's opinion merely because it was solicited by the claimant's attorney, the Gonzales Perez and Reddick courts make clear that an ALJ's decision "can still pass muster if the other reasons given to accord medical reports little weight are adequately supported." Rodriguez v. Astrue, 694 F. Supp. 2d 36, 45 (D. Mass. 2010); see Coggon v. Barnhart, 354 F. Supp. 2d 40, 58 (D. Mass. 2005) (finding ALJ's decision to assign "lesser weight" to "advocacy opinion" was warranted because it was "unsupported by clinical evidence"). Here, the ALJ did not devalue or dismiss the opinions of Dr. Crooks and Therapist Vukmirovits based on "timing and impetus," or because they were solely an advocacy opinion, but rather, as discussed above,

because the ALJ found them to be inconsistent with the longitudinal history recounted throughout the ALJ's decision.

## C.    BIAS

Finally, interspersed with the claims addressed above, is Lobov's accusation that the ALJ was biased and was prepared to reject any opinion to avoid "pay[ing] this case." (Docket 16 p. 16). In leveling this accusation, Lobov, in essence, asks this court to re-weigh the evidence.

The record refutes the allegation of bias. It shows that the ALJ considered each opinion and, as discussed above, provided credible and identifiable reasons for the weight attributed to each opinion, regardless of whether it supported or discredited the disability claim. For instance, the ALJ assigned only some weight to the opinions of Dr. Upadhyay and Dr. Montoya (that Lobov was not nearly as limited as Lobov claimed and that she could handle light work, occasionally climb and stand or walk for at least two hours in an eight-hour work day) because the ALJ found that Lobov's "residual functional capacity is more consistent with sedentary work." (Tr. 60). Similarly, the ALJ did not dismiss the opinion of Dr. Crooks, but assigned it significant, non-controlling weight. (Tr. 56). The ALJ's assessment of the conclusions of Therapist Vukmirovits was accompanied by a detailed explanation that belied Lobov's claim of bias. (Tr. 60). Among other things, the ALJ determined that the opinion of Therapist Vukmirovits "is not given significant probative weight, as it is not from an acceptable source, the cosign notwithstanding."[8] (Id.). The medical opinions of "treating sources" are given "more

---

[8] In Nichols v. Commissioner of the Social Security Administration, 260 F. Supp. 2d 1057 (D. Kan. 2003), the court addressed the issue of whether an opinion by a nurse practitioner must be assigned "controlling weight" because it was signed by an acceptable medical source. 260 F. Supp. 2d at 1065-66. The Nichols court held that the mere co-signing of a report by an acceptable medical source is insufficient to warrant an assignment of "controlling weight." Id. at 1066. Instead, the court found that such a report must be based on an actual evaluation from the acceptable medical source in order to be entitled to controlling weight. Id. Here, the ALJ

weight" than non-treating sources, and are assigned "controlling weight" if certain conditions are satisfied. 20 C.F.R. § 404.1527(c)(2). A "treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502; see SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."). This is a statutorily sound reason for assigning, as the ALJ did, little weight to Therapist Vukmirovits' conclusions.

Finally, while these opinions that Lobov claims were rejected out of bias might lead to a different conclusion on the question of disability, her implicit invitation to the court to consider them and re-weigh the evidence is rejected. "[I]t is not for the Court to reweigh the evidence or substitute its judgment for that of the hearing officer." Amaral v. Comm'r of Soc. Sec., 797 F. Supp. 2d 154, 163 (D. Mass. 2011). The ALJ, not this Court, is responsible for determining issues of credibility and drawing inferences from the entire record. Irlanda Ortiz, 955 F.2d at 769. As a result, this Court must uphold the ALJ's decision so long as it is supported by substantial evidence. Id. A review of the record clearly demonstrates that the ALJ accorded appropriate weight to the opinions of treating sources and, therefore, his decision is supported by substantial evidence.

---

explicitly stated that "[Dr. Kaplan] was not established as expressing an opinion derived from longitudinal treatments, and was merely and uncritically accepting the opinion of a less than acceptable source." (Tr. 60). As a therapist, Vukmirovits is not an acceptable medical source and the mere signature of Dr. Kaplan, without any evaluation, had no bearing on the ALJ's discretion to assign weight to Therapist Vukmirovits' opinion based on all the evidence before him.

## CONCLUSION

For the foregoing reasons, this Court recommends to the District Judge that the Plaintiff's Motion for an Order Reversing the Decision of the Commissioner (Docket #15) be DENIED, and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket #21) be GRANTED.[9]

*/s/ David H. Hennessy*
David H. Hennessy
United States Magistrate Judge

---

[9] The parties are hereby advised that, under the provisions of Federal Rule of Civil Procedure 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).